**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

---

A.D., an individual;

               Plaintiff

     -against-

WYNDHAM HOTELS AND RESORTS, INC.;

            Defendants.

CIVIL ACTION NO :4:19-CV-120

**COMPLAINT**
**JURY TRIAL DEMANDED**

---

## COMPLAINT

COMES NOW the Plaintiff A.D., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct so that they may continue earning a profit at the expense of human life, human rights, and human dignity.

2. Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") knows and has known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, the Defendant has instead chosen to ignore the open and obvious presence of sex trafficking across their brands, enjoying the profit from rooms rented for this explicit and apparent purpose.

3. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    A.D. was trafficked for commercial sex in and around Southeast Virginia. In 2012, at 26 years old, A.D. was suddenly going through a divorce and struggling to afford housing after her husband was incarcerated.  She met people through a friend who offered her a job driving for them on a regular basis. A.D., who had no way of supporting herself, agreed but later came to realize that she was driving for a criminal enterprise.  One of the men involved pretended to be interested in A.D. and when she finally eased to his advances he became astoundingly violent and forced her to sexually service strangers for his financial gain. Throughout the next month A.D. regularly endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels as the Defendants did nothing but profit.

5.    The Plaintiff now brings this action for damages against the Defendant listed herein.  Wyndham Hotels and Resorts, Inc. in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.    A.D. was advertised on Backpage.com, physically tortured, and then sexually exploited under duress at hotels throughout Hampton Roads, including the Days Inn® and Super 8® in Hampton, Virginia.

7.    As a direct and proximate result of the Defendant's consistent refusals to prevent and stop human trafficking at their hotels, A.D. was trafficked for commercial sex, sexually exploited, and victimized repeatedly at Wyndham hotels.

8.    The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595 against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a venture in which A.D. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

## PARTIES

9.    The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials

---

[1] Contemporaneously with the Complaint, Plaintiff A.D. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently

A.D., was 26 years old when she was first sold for sex and trafficked throughout the Hampton Roads area.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).   The Plaintiff currently resides in Powhatan County, Virginia.

10.   Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It offers public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation and can be served by its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware 19810.

  a.   Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to the former Wyndham Worldwide Corporation and therein retains successor liability for the wrongful acts of its predecessor.

  b.   Days Inn® and Super 8® are both Wyndham brand properties.

  c.   As a hotel operator, Defendant Wyndham controls the training and policies for its branded properties including the Days Inn® and Super 8® hotels where A.D. was trafficked.

  d.   Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.[2]

  e.   By and through its relationship with the staff at the Days Inn® and Super 8® hotels where A.D. was trafficked and the perpetrator who trafficked her at the Days Inn® and Super 8® hotels while a guest there, Defendant Wyndham knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which

intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.
[2] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20, 2019).

it knew, or should have known, to engage in sex trafficking.

    f.    Wyndham receives a percentage of the gross room revenue generated by the operations of Days Inn® and Super 8® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

    g.    Wyndham owns, supervises, and/or operates the Days Inn® Hampton located at 1918 Coliseum Drive, Hampton, Virginia 23666 and the Super 8® Hampton located at 1330 Thomas St, Hampton, Virginia 23669.

    h.    Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Virginia, operates dozens of hotels in Virginia, including the Days Inn® Hampton and the Super 8® Hampton, contracts to supply services in Virginia, caused indivisible injuries to the Plaintiff in Virginia, and profited from an illegal sex trafficking venture at the Days Inn® Hampton and Super 8® Hampton.

11.   Whenever reference is made in this Complaint to any act, deed or conduct of the Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

12.   This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

13.   Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

14.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

15.   To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

16.   Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

17.   Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[3]

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.

## FACTUAL ALLEGATIONS

## A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation...Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project [4]*

18.   Human trafficking is the world's fastest growing crime.[5]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[6]

19.   Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

20.   The hospitality industry plays a crucial role in the sex trade.[7]   The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

21.   According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[8]   Traffickers and buyers alike frequently use hotel rooms to exploit victims.

22.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred

---

[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[5] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[6] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[7] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[8] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

to as an 'in call'.

23.   Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.  In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[9]

24.   The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[10]

25.   Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[11]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

26.   Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

27.   But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[10] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[11] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

liable for failing to do so."[12]

28.   Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[13]

29.   From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

30.   Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[14]

31.   Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[15] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

32.   Hospitality companies can and should mandate that *all* staff working at *all* hotel properties

---

[12] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[14] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[15] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

across their brand complete sex trafficking training.[16]

33.   The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

34.   In 2011, Wyndham Hotels trained only some of its employees to look for signs of trafficking.[17]

35.   In 2012, an anti-trafficking coalition alerted Defendants Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[18]

36.   Choice Hotels claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[19]

37.   Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[20]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[21]

38.   Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their

---

[16] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[17] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

[18] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

[19] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).

[20] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[21] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**B.    THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY**

39.   Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brand's control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

40.   The average consumer does not see this relationship.  The parent brand gives the local property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the known parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

41.   In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent.[22]

42.   The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

43.   The parent brand may enforce these standards through periodic inspections and even termination of the contract or franchise agreement if the local hotel is found to be inadequate.  This right of the parent hotel brand to enforce their brand standards is also their responsibility.

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

44.   At the time of the incidents alleged herein:

    a.   Defendant Wyndham owned and controlled both the Days Inn® and Super 8® brands.

45.   Parent hotel brands may kick delinquent hotels out of their system but because it is at the expense of terminating their royalty payments it is scarcely done.

## C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

46.   Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring at their Days Inn® and Super 8® hotels yet they failed to take the action necessary to prevent sex trafficking and still persist in failing to take the necessary actions to prevent or stop sex trafficking at their hotels.

47.   WYNDHAM  HOTELS AND RESORTS, INC. ("Wyndham")

    a.   Defendant Wyndham owns, supervises, or operates the Days Inn® Hampton located at 1918 Coliseum Drive and the Super 8® Hampton located at 1330 Thomas Street, in Hampton, Virginia.

    b.   Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

    a.   Wyndham knew or should have known that the Days Inn® and Super 8® hotels where Plaintiff A.D. was trafficked were in an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.[23]

    c.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to address them properly.

    d.   Defendant Wyndham could have exercised control over Days Inn® and Super 8® hotels by:

        i.   distributing information to assist employees in identifying human trafficking;

---

[23] https://www.pilotonline.com/news/crime/article_62e487bc-2de9-11e8-9ed0-0bae82ba09b2.html

    ii.   providing a process for escalating human trafficking concerns within the organization;

    iii.  requiring employees to attend training related to human trafficking;

    iv.  providing new hire orientation on human rights and corporate responsibility;

    v.   providing training and education to Days Inn® and Super 8® hotels through webinars, seminars, conferences, and online portals;

    vi.  developing and holding ongoing training sessions on human trafficking; or

    vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

e.  Wyndham was in an agency relationship with Days Inn® and Super 8® hotels offering public lodging services. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Days Inn® and Super 8® hotels by Wyndham's operations, including the means and methods of how Days Inn® and Super 8® branded hotels conducted daily business through one or more of the following actions:

    i.   hosting online bookings on Defendant Wyndham's domain;

    ii.  requiring Days Inn® and Super 8® branded hotels to use Wyndham's customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.   advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by the owner;

    ix.  standardized or strict rules of operation;

      x.   regular inspection of the facility and operation by owner;

      xi.   fixing prices; or

      xii.   other actions that deprive Days Inn® and Super 8® branded hotels of independence in business operations.

f.   An apparent agency also exists between Defendant Wyndham and Days Inn® and Super 8® hotels. Defendant Wyndham held out Days Inn® and Super 8® hotels to the public as possessing authority to act on its behalf.

g.   Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Days Inn® and Super 8® branded hotels, Defendant Wyndham breached its duties in the following ways:

      i.   did not adequately distribute information to assist employees in identifying human trafficking;

      ii.   failed to provide a process for escalating human trafficking concerns within the organization;

      iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

      iv.   failed to provide new hire orientation on human rights and corporate responsibility;

      v.   failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

      vi.   failed to develop and hold or require ongoing training sessions on human trafficking; or

      vii.   failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

48. For years, Defendant Wyndham has demonstrated a willful blindness to the rampant culture of sex trafficking which tragically occurs throughout its Days Inn® and Super 8® brands across the country. This entrenched and pervasive negligence regarding sex trafficking facilitated the trafficking of Plaintiff A.D. at Days Inn® and Super 8® hotels that forms the basis of this complaint.

a. Days Inn®

    i. In February 2019, a man was caught running a human trafficking operation out of a Days Inn® in Madison Heights, Michigan.[24]

    ii. In August 2018, four (4) people were arrested for trafficking a fifteen year old girl out of a Marietta, Georgia Days Inn®.[25]

    iii. In October 2015, a man was arrested for running a sex trafficking ring out of a Days Inn® in Reading, Pennsylvania.[26]

    iv. In September 2018, a woman was trafficking two (2) underage girls for commercial sex out of a Days Inn® in Fayetteville, NC.[27]

    v. In July 2018, a man used social media websites to coerce a young girl from Texas to Gulfport, Mississippi. When she arrived, he forced her to perform commercial sex acts for his benefit at a Days Inn® along US 49.[28]

    vi. In December 2018, a married couple coerced females from China to move to Maine by offering them tourism visas. Upon their arrival, women and girls were stripped of their identification, advertised as prostitutes on Craigslist, and forced to sexually service men at Days Inn® in Dover, New Hampshire.[29]

---

[24] https://www.fox2detroit.com/news/man-charged-for-sex-trafficking-out-of-madison-heights-days-inn
[25] https://www.mdjonline.com/news/marietta-sex-trafficking-ring-thwarted-police-say/article_997739c0-a55b-11e8-9647-338800611347.html
[26] https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward
[27] https://www.fayobserver.com/news/20180921/fayetteville-woman-charged-in-human-trafficking-operation
[28] https://www.sunherald.com/news/local/crime/article215055145.html
[29] https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme

vii.  In June 2018, three (3) individuals were arrested in a human trafficking for operating scheme at a Days Inn® in Virginia Beach, Virginia.[30]

viii.  In June 2018, a man enticed a 15 year old girl from her residential home. He then took her to a Days Inn® in Tannersville, Pennsylvania where he forced her to sign a contract and work as a sex servant.[31]

b.  Super 8®

i.  The Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments in August 2012, of several persons charged with human trafficking which occurred at the Super 8® on Dublin-Granville Road in Columbus, Ohio as well as other locations.[32]

ii.  A trafficker took at seventeen (17) year old girl to a Super 8® in West Greenwich, Rhode Island in September 2013 and ultimately pled guilty to federal sex trafficking charges for his criminal conduct.[33]

iii.  In June 2014, federal authorities charged a man with human trafficking after arresting him at a Super 8® in Wyoming, Michigan where he had taken a fifteen (15) year old girl.[34]

iv.  An undercover federal agent discovered two (2) girls, ages eighteen (18) and fifteen (15), at a Super 8® in El Paso, Texas in July 2016, and charged their trafficker with two (2) counts of sex trafficking children by force.[35]

---

[30] https://www.wavy.com/news/local-news/virginia-beach/three-sex-trafficking-suspects-arrested-by-virginia-beach-police/1213339402
[31] https://www.neagle.com/news/20161110/man-found-guilty-of-sex-trafficking-15-year-old-girl
[32] https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html
[33] https://www.providencejournal.com/breaking-news/content/20140227-missouri-man-pleads-guilty-to-sex-trafficking-for-bringing-17-year-old-massachusetts-girl-to-rhode-island.ece
[34] https://www.mlive.com/news/grand-rapids/index.ssf/2014/06/man_accused_of_human_trafficki.html

[35] https://www.elpasotimes.com/story/news/2017/04/21/man-pleads-guilty-sex-trafficking-case/100754896/

v.   Two (2) men were arrested in Frederick, Maryland at a Super 8® Motel and in approximately October 2016, were charged with human trafficking-related offenses in relation to their crimes against a juvenile victim.[36]

vi.   From February 2016 through approximately October 2017, a sex trafficking ring operated out of a Super 8® in Fort Worth, Texas and trafficked at least five (5) juveniles including an individual as young as sixteen (16) years old.[37]

vii.   Authorities busted a sex trafficking operation at a Super 8® in Lakeland, Tennessee in June 2017, and rescued a nineteen (19) year old girl who was being held against her will and sold for sex.[38]

viii.   A July 2018, investigation on the premises of the Super 8® Motel located at 2935 Warm Springs Road Columbus, Georgia  led to human trafficking charges against multiple suspects.[39]

ix.   A sixteen (16) year old boy who authorities believe to be a victim of human trafficking was rescued from a Super 8® in Duson Louisiana in August 2018.[40]

x.   In September 2018, a former member of the Oklahoma state legislature was sentenced to fifteen (15) years in prison on charges of child sex trafficking after he was found in room at a Super 8® in March 2017, with a seventeen (17) year old boy.[41]

### D.  THE SEX TRAFFICKING OF A.D.

49.   The facts alleged herein stem from a sex trafficking operation in Hampton Roads, Virginia.  In 2012, at 26 years old, A.D. was suddenly going through a divorce and struggling to afford housing after her husband was incarcerated.  She met people through a friend who offered her a job driving for them on

---

[36] https://www.nbcwashington.com/news/local/Two-Charged-in-Maryland-with-Rape-Human-Trafficking-Others-395505801.html
[37] https://www.star-telegram.com/news/local/community/fort-worth/article179323426.html
[38] http://www.wmcactionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[39] https://www.ledger-enquirer.com/latest-news/article214760585.html
[40] https://www.klfy.com/news/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/1360573674
[41] https://www.klfy.com/news/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/1360573674

a regular basis.  A.D., who had no way of supporting herself, agreed but later came to realize that she was driving for a criminal enterprise.

50.   One of the men involved pretended to be interested in A.D. and when she finally eased to his advances he became astoundingly violent and forced her to sexually service strangers for his financial gain. Throughout the next month A.D. regularly endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels as the Defendant did nothing but profit.

51.   The night A.D. was first turned out, her trafficker had bought a hotel room at the Jameson Inn located at 21 Old Oyster Point Road in Newport News, Virginia because she had just lost her home. It seemed like a kind gesture, but A.D.'s trafficker then blocked her exit from the room and demanded that she perform commercial sex acts to pay him back for the room. Understanding what he was requiring of her, A.D. rushed to leave but her trafficker chased her down the hallway, grabbed her by her hair, and dragged her by her hair back to the room as she was kicking and screaming in defiance.  Many hotel guests saw and heard the ordeal.

52.   While victimized by her trafficker in southeast Virginia, A.D. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendant's hotels for over a month.

53.   A.D. was routinely required to have sex for payment with various buyers at the Defendant's hotels in response to advertisements for commercial sex that her trafficker posted on Backpage.com and Craigslist without her consent.[42] At the end of each night, A.D's trafficker would take 100% of the money that A.D. made. In the commercial sex transaction, the money was given to A.D. who then had to give all of it to her trafficker who then demanded that she undress in front of him and would then digitally penetrate A.D.'s body cavities to insure that she was not hiding any money from him.

54.   A.D.'s trafficker had approximately four (4) other women that he was exploiting at the same time

---

[42] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See STAFF OF PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; 118TH CONG., REP. ON BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (Comm. Print 2017).

as A.D. And, in addition to punishing each of them with cruel physical violence every time they failed to conform to his abundant rules, A.D.'s trafficker also controlled the women by making them each dependent on heroin and crack cocaine.

55.  A.D's trafficker operated primarily out of the Super 8® Hampton located at 1330 Thomas St, Hampton, Virginia 23669 and paid many of the hotel employees there to remain quiet regarding his operation there.

56.  A. D.'s trafficker always used his name to book the rooms and paid in cash. He would rent a number of rooms for varying lengths of time and would frequently extend the stays by individual nights.

57.  A.D. was forced to perform commercial sex acts on as many as fourteen men in an evening.  But on average she was required to service approximately seven (7) men each day. Each man entered and exited the Super 8® Hampton through the hotel's front entrance directly in front of the hotels front desk. The foot traffic was constant and voluminous and many of the men were regular and repeat customers.

58.  The room was frequently left with numerous used condoms scattered across various surfaces at the end of the stay.  A.D.'s trafficker repeated this process multiple times at the Super 8® Hampton.

59.  While in her trafficker's custody, A.D. saw the hotel staff of the Super 8® Hampton only when she was entering or leaving the hotel. She exhibited prominent and obvious injuries, a sunken face, and withdrawn demeanor. For example, A.D.'s trafficker broke her nose at least twice, and caused numerous lacerations to her face and lips that were apparent and visible to the public.

60.  A.D.'s trafficker was extremely physically violent, and there were numerous assaults that were loud enough for hotel staff and passerby's to hear from A.D.'s room at the Super 8® Hampton.

61.  A.D. was also forced to service buyers under her trafficker's watch at the Days Inn® Hampton located at 1918 Coliseum Drive, Hampton, Virginia 23666.

62.  Again, A.D. was forced to perform commercial sex acts on an average of seven (7) men each day.  Each of the buyers entered the Days Inn® Hampton as a non-paying guest and left shortly after they arrived.  The foot traffic to the rooms was constant and voluminous and the doors to each room faced the outside.

63.   A.D.'s trafficker paid in cash for numerous rooms booked in his name and at the end of each day abundant used condoms were scattered across the rooms.

64.   On several occasions, A.D.'s traffickers injured her so badly that she knew it was noticeable to the public. Paraphernalia was often left in the rooms when they left, and there was direct contact between her trafficker and hotel staff.

65.   A.D. escaped from the Days Inn® after a particularly brutal beating that left her trafficker so exhausted he fell asleep. Knowing that the hotel staff was too involved with her trafficker, A.D. instead ran, visibly injured, to the nearest gas station.

66.   Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendant failed to take any actions to curtail these activities.

67.   Had the Defendant been paying attention to the activities being conducted at their hotels, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.D.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.

68.   Wyndham profited from the sex trafficking of A.D. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendant leased rooms to A.D.'s trafficker, when they knew, or should have known, that he was using their room to imprison A.D., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

69.   Wyndham knew that they were benefiting financially from a venture that they knew, or should have known, that was trafficking A.D. because A.D.'s trafficker frequented the Defendant's hotels.

70.   Wyndham knew, or should have known, that A.D. was being trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas as did each of her other's trafficker's rooms, and her trafficker would escort her whenever she left her room; behavior that indicated he was using the Defendant's hotels for his illegal sex trafficking venture.

71.     Defendants Wyndham actively participated in this illegal endeavor by knowingly or negligently providing lodging to A.D.'s trafficker in which to harbor A.D. while he was trafficking her.

72.     Defendant Wyndham profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker in his criminal venture. The hotel took no action as A.D. repeatedly visited, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, poor hygiene and often displaying prominent bruising all over her person.

73.     Defendant Wyndham further participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from A.D. in which to harbor A.D. while she was being trafficked.

74.     The Defendant had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her.  Instead, the Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

75.     The Defendant financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

76.     Wyndham enjoys the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Super 8® and Days Inn®.

77.     Wyndham financially benefits from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

78.     The Defendant failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

79.     The Defendants maintained their deficiencies to maximize profits by:

          a.   Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

c. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

80.    As a direct and proximate result of these egregious practices on the part of the Defendants, A.D. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A.  COUNT ONE – 18 U.S.C §1595 ("TVPRA")

81.    The Plaintiff A.D. incorporates each foregoing allegation.

82.    A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

83.    The Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendant had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a).  At all relevant times, the Defendant breached this duty by participating in, and facilitating, the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

84.    The Defendant has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.  Moreover, the Defendant directly benefitted from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at their hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of A.D.'s injuries and damages.

21

85.   A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendant's hotels and properties in violation of 18 U.S.C. §1591 (a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and the Defendant, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendant's conduct outlined as follows:

a.   All available compensatory damages for the described losses with respect to each cause of action;

b.   past and future medical expenses, as well as the costs associated with past and future life care;

c.   past and future lost wages and loss of earning capacity;

d.    past and future emotional distress;

e.   consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   disgorgement of profits obtained through unjust enrichment;

h.   restitution;

i.   punitive damages with respect to each cause of action;

j.   reasonable and recoverable attorneys' fees;

k.   costs of this action; and

l.   pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendant's wrongs, and which will effectively

prevent other similarly caused acts.   Further, the Plaintiff requests that the Court enter judgment

consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury

deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: December 2, 2019

**RESPECTFULLY SUBMITTED,**
**PLAINTIFF,**
**By Her Attorneys,**


_____/s/ Brielle M. Hunt_____
Michael G. Phelan, Esq. (VSB No. 29725)
Brielle M. Hunt, Esq. (VBS No. 87652)
PHELAN PETTY, PLC.
6641 West Broad Street, Ste. 406
Richmond, VA 23230
804-980-7100- Telephone
804-767-4601 – Facsimile
mphelan@phelanpetty.com
bhunt@phelanpetty.com

*Counsel for Plaintiff*